IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| 6060 CORP. | : | CIVIL ACTION |
|     Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MEDMARC CASUALTY INSURANCE | : | |
| GROUP COMPANY, | : | No. 2:12-cv-3659 |
|     Defendant. | : | |

MEMORANDUM

Legrome D. Davis, J.                                                                              February 19, 2013

I.     FACTS AND PROCEDURAL HISTORY

      This case arises from a contract dispute between insurance companies. The crux of the dispute is whether Plaintiff 6060 Corporation f/k/a Norman Spencer, Inc. ("Plaintiff" or "6060"), in assuming certain liabilities and obligations from the Administrators for the Professions of Delaware, Inc. ("AFPD"),[1] assumed the duty to arbitrate all disputes related to the pre-existing Program Manager's Agreement entered into between AFPD and Defendant Medmarc Insurance Company ("Defendant" or "Medmarc").

    A.     Program Manager's Agreement

      This origin of this litigation can be traced back to September 1, 2002, when Medmarc and non-party AFPD entered into a Program Managers Agreement (the "PMA"). Pursuant to the PMA,

---

[1] AFPD and 6060 entered into an Asset Purchase Agreement (the "APA") in 2009, and subsequent to that agreement, AFPD changed its name to "RFPD AFPD, Inc.," and 6060 acquired the name, "AFPD." For the sake of clarity, this Memorandum will refer to the companies according to their names prior to the APA.

1

AFPD undertook responsibilities related primarily to managing Medmarc's professional liability claims. (See generally Doc No. 26, Ex. A; Ex. E; Ex. F). The PMA contains an arbitration clause, which provides that "[a]ny dispute arising out of [the PMA] shall be submitted to the decision of a board of arbitration . . ." (Doc. No. 26, Ex. A, at § 24). The PMA also contains a non-assignment provision, stating that the PMA "shall not inure to the benefit of any successor-in-interest of [AFPD], nor may [AFPD] assign any interest or obligation of [AFPD] under [the PMA] in whole or part without prior written consent of [Medmarc]." (See Doc. No. 26, Ex. A, at § 31).

     B.     Asset Purchase Agreement

On August 31, 2011, 6060 entered into an Asset Purchase Agreement ("APA") with AFPD whereby 6060 acquired essentially all of the assets from AFPD.[2] (See Doc. No. 26, Ex. B). In contrast to its large acquisition of assets, 6060 significantly limited its purchase of AFPD's liabilities and obligations. Among the limited "Assumed Liabilities" purchased by 6060 were "liabilities and obligations arising *on or following* the Closing in connection with or in relation to . . . the [PMA]." (Doc. No. 26, Ex. B, at § 1.2. (emphasis added)). 6060 further limited its liability by not assuming "any obligation or liability resulting from or arising out of any default, or nonperformance by [AFPD] of any Assumed Liability prior to the Closing Date [August 31, 2011]." (Id.). Any liabilities or obligations not assumed by 6060 under the APA were to remain the sole obligation of AFPD. (Id.).

On September 2, 2011, two days after the APA became effective, Medmarc sent AFPD an

---

[2] Among the acquired assets were AFPD's "Client Contracts," which included the PMA. (See Doc. No. 26, Ex. B, at § 1.1(a) and Schedule 1.1A (listing the PMA as the "Medmarc Program Administrator Agreement")).

email stating the following: "Thank you for advising of the change in ownership of AFPD, pursuance (sic) with the terms of our Program Manager's Agreement (PMA). Understanding terms of the PMA survive this change in ownership Medmarc offers no objection." (Doc. No. 31, Ex. C).

In August 2009, three years prior to the APA, AFPD and Medmarc terminated the PMA with respect to any new claims filed thereafter. (See Doc. No. 27, at ¶ 13). AFPD remained responsible for completing any of the limited "run-off work" related to claims filed prior to the termination agreement, meaning that AFPD was responsible for "completing whatever work . . . needed to be done that was already in the pipeline" when the agreement was terminated. (See Doc. No. 27, Ex D-2, at 66). Thus, by the August 31st closing on the APA, AFPD was responsible for only the limited amount of Medmarc business that existed prior to the PMA termination in August 2009. Following the APA, 6060 acquired that limited "run-off" business from AFPD for three months. On December 1, 2011, Medmarc reacquired responsibility for all of the "run-off" business.

  C. The McCormick Claim

In March 2012, counsel for Medmarc sought indemnity against both AFPD and 6060 for a professional liability claim known as the "McCormick Claim." The McCormick Claim refers to an insurance claim filed by a Florida law firm in March 2006. The law firm filed the claim after a malpractice lawsuit had been brought against it (the "McCormick Action"). (Doc. No. 31, Ex. F, at ¶ 13). The McCormick Action eventually went to trial in November 2011, and in March 2012, a judgment was issued against the law firm in excess of five (5) million dollars.

According to Medmarc, it did not become aware of the McCormick trial until it received a copy of the judgment from the law firm's independent counsel in March 2012, seeking coverage

3

for the judgment. (Doc. No. 31, Ex. F, at ¶ 38). On March 28, 2012, Medmarc sought indemnity from AFPD under the terms of the PMA "for all liability, loss, damage, or expense as a result of the acts and omissions of AFPD in its claim management and servicing of the McCormick Action." (Id. at ¶ 39). That same day, Medmarc simultaneously made a claim for indemnity under the terms of the PMA against 6060 for its handling of the McCormick Action.

AFPD and 6060 both refused Medmarc's demand for indemnification. As a result, Medmarc paid for and posted an appeal bond for the McCormick judgment. Thereafter, on June 11, 2012, Medmarc sent AFPD and 6060 a Demand for Arbitration under the PMA, indicating its intent to resolve all disputes related to the McCormick Claim through arbitration.[3] (See Doc. No. 26, Ex. E). In response, 6060 filed the instant Complaint, seeking a declaratory judgment that it is not obligated to arbitrate any dispute with Medmarc under the PMA or otherwise, and to enjoin Medmarc from seeking to pursue any claim against 6060 in arbitration or forcing 6060 participate in any arbitration. (See Doc. No. 1, at 6).

The day after it filed its Complaint, 6060 filed a motion for summary judgment, alleging that this case could be resolved solely upon the language of the relevant contract provisions. Medmarc opposed the motion and simultaneously cross-moved for summary judgment in its favor. Despite its concession that the summary judgment motions were ripe for disposition, Medmarc nonetheless urged that this Court to postpone resolving the dispositive motions until after discovery. Following a conference with all parties, we denied the motions for summary judgment as premature without prejudice, and granted a limited discovery period. Following discovery, both

---

[3] Medmarc also served the Demand for Arbitration upon a principal for AFPD, Seth Goldberg.

parties filed renewed motions for summary judgment, which are now ripe for disposition.

II.     DISCUSSION

   A.     Standard of Review

Under Federal Rule of Civil Procedure 56(a), we must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Accordingly, the nonmoving party cannot avoid summary judgment "merely by restating the allegations of his complaint, but must point to concrete evidence in the record that supports each and every essential element of his case." Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995) (citing Celotex, 477 U.S. at 322). "The mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Where, as here, the parties file cross-motions for summary judgment, the Court "construes facts and draws inferences in favor of the party against whom the motion under consideration is made." Pichler v. UNITE, 542 F.3d 380, 386 (3d Cir. 2008) (quotation omitted).

   B.     Legal Analysis

Arbitration disputes are governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. ("FAA"), and in general, "there is a presumption in favor of arbitrability." Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005). "The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon

the demand of a party to the dispute." Century Indem. Co. v. Certain Underwriters at Lloyd's, 584 F.3d 513, 523 (3d Cir. 2009). Rather, a party will not be compelled to arbitrate unless the court concludes that "(1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." Id.

The dispute in this case turns on the first prong; i.e., whether 6060 agreed with Medmarc to submit its disputes concerning the McCormick Claim to arbitration, even though 6060 is not a party to the PMA. Seeking to avoid arbitration, 6060 sets forth two main arguments. First, 6060 contends that the PMA's anti-assignment clause prevented any valid assignment of the PMA's arbitration clause from AFPD to 6060. Second, 6060 argues that regardless of assignment, 6060 expressly assumed only certain liabilities of AFPD related to the PMA, and those liabilities do not include the McCormick Claim.

Medmarc recognizes that 6060 is not a signatory to the PMA, but argues that the PMA arbitration clause may nevertheless be enforceable against it. Medmarc agrees that 6060 assumed only certain liabilities of AFPD, but argues that those liabilities included obligations related to the McCormick Claim. Medmarc also contends that even if no express assumption occurred, the doctrine of equitable estoppel binds 6060 to arbitration. We address all of the arguments below, and find in favor of 6060.

    1.    Assignment of the PMA

6060 argues that the PMA's anti-assignment clause prevented any valid assignment of the PMA from AFPD to 6060. Specifically, 6060 argues that the PMA's anti-assignment clause requires Medmarc's prior written consent, which it did not provide. To determine whether an arbitration agreement exists between two parties, the FAA "instructs courts to refer to principles of

applicable state law." Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005) (citing Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 475 (1989)). Because we are concerned with the assignment of the PMA, the choice of law provision of that agreement, calling for the application of Virginia law, applies. (Doc. No. 26, Ex. A, at § 22).

Under Virginia law, a contractual ban on assignment typically protects only the obligor (here, Medmarc), and does not imperil the transaction as between assignor and assignee. See, e.g., Bell BCI Co. v. Old Dominion Demolition Corp., 294 F. Supp. 2d 807, 812-13 (E.D. Va. 2003). In this case, Medmarc does not contest that it consented to the assignment, which effectively waives the prior written consent requirement. See id. Therefore, the anti-assignment provision in the PMA does not render the assignment of the PMA (in whole or in part) invalid. However, the validity of the assignment is not the relevant inquiry. Rather, the determinative issue is whether the assignment included the duty to arbitrate the McCormick Claim. That issue is addressed below.

    2.    Assumption of Liability

Medmarc contends that 6060 expressly assumed certain of AFPD's obligations under the PMA, including the duty to arbitrate disputes related to the McCormick Claim. Under Pennsylvania law,[4] when an assignee assumes certain liabilities of an assignor, the assignee will

---

[4] Although the PMA calls for application of Virginia law to the construction of its terms, the instant analysis concerns the duties assumed by 6060 under the APA, which does not directly implicate the enforceability of the PMA arbitration clause. Because we are concerned with the duties assumed by 6060 under the APA, the choice of law provision of that agreement, calling for the application of Pennsylvania law, applies. (Doc. No. 26, Ex. B, at § 6.9); Cf. Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005).

7

generally be bound by the arbitration clause in the underlying contract for any disputes related to those assumed liabilities. See, e.g., Smith v. Cumberland Grp., Ltd., 455 Pa. Super. 276 (1997) (holding that assignee-contractor was bound to arbitrate claims against property owner for disputes related to construction contract originally entered into between property owner and assignor-contractor). Here, the PMA arbitration clause covers all disputes arising under that agreement. Accordingly, 6060's agreement to arbitrate with Medmarc is coextensive with the substantive obligations assumed by 6060 under the APA. See Trippe Mfg. Co. v. Niles Audio Corp., 401 F.3d 529, 532 (3d Cir. 2005). Thus, whether 6060 must arbitrate its disputes related to the McCormick Claim with Medmarc depends on whether 6060 assumed any substantive liability related to the McCormick Claim under the APA.

Under the APA, 6060 limited its assumption of liability to those "liabilities or obligations arising on or following the [August 31, 2011] Closing in connection with or in relation to [the PMA]." (Doc. No. 26, Ex. B, at § 1.2). Not only did 6060 assume liabilities that arose strictly on or after the closing date, but it also expressly disclaimed any obligations or liabilities "resulting from or arising out of any default or nonperformance by [AFPD] of any Assumed Liability prior to the Closing date." (Id.). Thus, 6060 did not assume all liabilities and obligations related to the PMA. Rather, 6060 assumed responsibility only for those obligations that (a) arose on or after August 31, 2011, and (b) related to the limited "run-off" pre-existing Medmarc business that AFPD had continued to handle.

Throughout its documents, Medmarc emphasizes how 6060 admits "that through the APA, [6060] only had obligations that . . . related to the limited run-off of pre-existing Medmarc business that AFPD had been handling." (Doc. No. 27, at 2 (ellipses in original); see also Doc No. 31, at 7

("Plaintiff also admitted that it assumed liabilities under the PMA, including duties related to the 'run-off' claims AFPD had been handling")). Medmarc argues that because the McCormick Claim is included in the "run-off" business that survived the PMA termination, 6060 assumed the obligation to arbitrate under the PMA any disputes related to that claim. In making this argument, however, Medmarc overlooks the fairly obvious temporal condition, which it conveniently omits through the use of an ellipses: 6060 assumed liabilities related to run-off business that *also* arose "on or after August 31, 2011." Upon even a cursory examination of Medmarc's own demand for arbitration served upon AFPD, it becomes clear that any liability or obligation related to the McCormick Claim arose years prior to August 31, 2011.[5]

According to the Medmarc's own demand for arbitration served upon AFPD, AFPD apparently became aware of the then-pending McCormick Action as early as March 13, 2006. (See Doc. No. 31, Ex. F, at ¶ 15). AFPD reviewed the complaint, but because no specific allegation of malpractice was alleged, it did not pursue the possibility of providing coverage for costs related to the Action at that time. (See id. at ¶ 17-18). In January 2007, AFPD closed the McCormick Claim file for the reason of "longstanding activity," despite a letter from the McCormick law firm sent in October 2006 explaining that the case was still pending. (See id. at ¶ 19-20).

The demand for arbitration goes on to allege that in February 2007, AFPD received a copy of an amended complaint for the McCormick Action. (See id. at ¶ 23). Subsequently, AFPD

---

[5] By no means does this Court suggest that AFPD — or any entity for that matter — is liable for the underlying judgment of the McCormick Action. That determination will be a wholly separate issue left for arbitration. Notwithstanding, we cannot ignore that based upon Medmarc's purported factual allegations set forth in its *own* demand for arbitration served upon AFPD, the existence of any liability or obligation related to the McCormick Claim unquestionably arose prior to August 31, 2011.

drafted two letters acknowledging a duty to provide a defense, but allegedly, neither of these letters was sent to the McCormick law firm and defense counsel was never retained for McCormick. (See id. at ¶ 24-26). Allegedly, no claims activity whatsoever occurred in this matter until July 2008, when AFPD entered in its claims computer that the amended complaint alleged legal malpractice, and noted its intent to send a reservation of rights letter. (See id. at ¶ 29). Despite the notation, AFPD neither sent a reservation of rights letter nor retained counsel for McCormick. See id. at ¶ 30).

According to the demand for arbitration, in January 2009, counsel for plaintiffs in the McCormick Action contacted AFPD to discuss possible settlement. (See id. at ¶ 31). AFPD reopened the McCormick Claim file, but did not conduct any other claims investigation, evaluation, or "perform any of its other duties under the PMA." (See id. at ¶ 32). At the time the McCormick Claim file was reopened, AFPD was allegedly aware that the McCormick Action was set for trial and that it had a duty to obtain any recent pleadings. (See id. at ¶ 33). According to the demand, AFPD failed to report any factual developments to Medmarc or otherwise perform its claims handling duties under the PMA. (See id. at ¶ 34). On September 29, 2009, AFPD re-closed the McCormick Claim file. (See id. at ¶ 35). The McCormick Action proceeded to trial in November 2011, and on March 7, 2012, a judgment in excess of five (5) million dollars was issued against the McCormick Law Firm. (See id. at ¶ 36-37).

This undisputed evidence reveals that the McCormick Claim was presented to and handled exclusively by AFPD years before 6060 entered into the APA, and that AFPD closed the McCormick Claim nearly three years prior to the APA. In fact, during the three months that 6060 administered any Medmarc claims (before Medmarc took them all back on December 1, 2011),

6060 did not handle, process, or have any notice of the McCormick Claim. Still, Medmarc argues that "[t]he absence of any affirmative action by [6060] does not absolve it from liability for the McCormick claim." (Doc. No. 31, at 7). While Medmarc may be correct, it misses the point. 6060 is not absolved from liability because it took no action on the McCormick Claim. Conversely, 6060 took no action because it was not responsible for the McCormick Claim in the first place.

Medmarc also contends that because the McCormick Action went to trial on November 14, 2011, there is a genuine issue as to whether liability related to the McCormick Claim arose after August 31, 2011. The fact that the five-year-old McCormick Action happened to proceed to trial in November 2011 does not affect whether 6060 is bound to arbitration because, as evidenced by Medmarc itself, any liability for that claim arose long before that trial date. Recognizing otherwise would mean that 6060 assumed *all* of AFPD's liability merely related to the "run-off" business—regardless of when that liability arose. Assumption of such liability is exactly what 6060 contracted to avoid when it added the unambiguous language, "on or following" August 31, 2011.

The two cases on which Medmarc relies in its motion for summary judgment are not to the contrary. In Trippe Manufacturing Company v. Niles Audio Corporation, the Third Circuit applied New York law to resolve a factually similar case. There, Niles Audio Corporation ("Niles") entered into an Exclusive Distribution Agreement ("EDA") with SL Waber, Inc. ("Waber"), similar to the PMA entered into between Medmarc and AFPD. Like our case, the EDA contained a provision that all disputes would be resolved by arbitration. On August 29, 2001, Waber entered into an Asset Purchase Agreement with Trippe, and similar to 6060, Trippe acquired essentially all

11

of Waber's assets, while expressly limiting its liabilities and obligations. Specifically, Trippe expressly assumed:

> (d) All liabilities, undertakings and obligations for all product warranty and connected equipment guarantees covering all products sold to customers of the Waber Business, regardless of whether the product was manufactured, assembled or sold prior to, on or after the date of Closing.
>
> (f) All liabilities and obligations of [Waber] arising after [August 21, 2001] under each of the Material Contracts listed on Schedule 1.1 (h) of the Disclosure Schedule.

Id. at 531.

Because Trippe had broadly assumed warranty and other contractual obligations, the Third Circuit held that the arbitration provision applied to those warranty claims and contractual obligations. More relevant to the instant case, however, the Third Circuit found that "because Trippe did not assume Waber's obligations arising prior to the effective date of the agreement . . . Trippe did not agree to arbitrate claims related to those unassumed obligations." (Id. at 533). Such is the situation here. 6060 expressly did not assume AFPD's obligations that arose prior to August 31, 2011, which includes the McCormick Claim. Therefore, 6060 did not agree to arbitrate disputes related to McCormick Claim with Medmarc under the PMA.

The Pennsylvania case that Medmarc relies upon requires the same result. In Smith v. Cumberland Group, Limited, 455 Pa. Super. 276, 288 (1997), a property owner and general contractor entered into a construction contract that contained an arbitration clause. The general contractor later assigned the entire construction contract to another contractor. Recognizing that an arbitration clause is assignable, the Pennsylvania Superior Court concluded that the assignee was compelled to arbitrate its claims against the property owner. Unlike the instant case, however, in

Smith, the *entire* contract was assigned from one party to the other. Here, AFPD assigned only those liabilities and obligations related to the PMA that arose on or after August 31, 2011; AFPD did not assign the PMA in its entirety. Therefore, Medmarc's reliance upon Smith is misplaced.

In sum, we agree with Medmarc that when 6060 assumed AFPD's liabilities and obligations related to the PMA "arising on or following" August 31, 2011, it also assumed the duty to arbitrate disputes related to *those* assumed obligations. What Medmarc broadly fails to recognize, however, is that the evidence presented by both parties clearly indicates that any obligation related to the McCormick Claim arose years before 6060 ever entered into the APA. Prior to signing the APA, 6060 expressly excluded liability for those very such claims. Forcing 6060 to arbitrate a dispute related to an expressly unassumed obligation would not only contradict the clear intent of the parties; it would be an incorrect application of the law.

3. Equitable Estoppel

Medmarc contends that even if 6060 did not expressly assume any liability related to the McCormick Claim, 6060 is nonetheless equitably estopped from denying its obligation to arbitrate disputes related to that claim. Medmarc did not cite, and this Court could not find, any Pennsylvania case that invokes the doctrine of equitable estoppel to bind a non-signatory to an arbitration agreement. Other courts, including the Third Circuit, have invoked equitable estoppel to hold "non-signatories to an arbitration clause when the non-signatory *knowingly* exploits the agreement containing the arbitration clause despite having never signed the agreement." E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber Resin Intermediates, S.A.S, 269 F.3d 187, 199 (3d Cir. 2001) (emphasis added); see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 779 (2d Cir. 1995) (estopping non-signatory from denying arbitration agreement where it

13

directly benefitted, rather than indirectly benefitted from the agreement); Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 418 (4th Cir. 2000) (applying equitable estoppel doctrine to bind non-signatory to an arbitration provision where the non-signatory "consistently maintained that other provisions of the same contract should be enforced to benefit him").

Medmarc contends that 6060 should be estopped from avoiding arbitration because Medmarc compensated 6060 for its time spent handling some of the "run-off" business from AFPD. Medmarc's evidence, however, reveals only that AFPD closed the McCormick Claim nearly three years prior to the APA, and that from the inception of the McCormick Claim (i.e., 2006 when the claim was first made to AFPD) through November 30, 2011, the total amount expended on the claim was in the amount of $3,629.66. (See Doc. No. 27, Ex. I, at 4). While the evidence suggests that AFPD billed Medmarc $1,333.90 at some point during that five year span for work on the McCormick Claim, there is absolutely no indication that 6060 received any compensation for work related to the McCormick Claim. This makes sense since the McCormick Claim was closed three years before 6060 ever entered the picture.

Like any principle of equity, "the 'linchpin' for equitable estoppel is fairness." Kramer v. Toyota Motor Corp., - - - F.3d - - - , No. 12-55050, 2013 WL 357792, at *10 (9th Cir. 2013). Here, 6060's conduct is not one of knowing exploitation of the agreement. 6060 is not seeking to enforce or exploit helpful provisions of the PMA while simultaneously avoiding the arbitration clause. In fact, 6060 has not sought any real benefits under the PMA at all—let alone, any benefits related to the McCormick Claim. Based on the evidence before us in this case, we cannot conclude that 6060's conduct rises to the level of unfairness or exploitation sufficient for

this Court to invoke the doctrine of equitable estoppel.

III.     CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, and Defendant's motion for summary judgment is denied. An appropriate order follows this memorandum.

BY THE COURT:

/s/ Legrome D. Davis

Legrome D. Davis, J.